IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
HELENA DIVISION

DARYAL T. NELSON and TOMMY
ARMSTRONG, individually and on
behalf of all persons similarly situated                                       PLAINTIFFS

V.                               No: 2:04CV00171 WRW
                                 No: 2:05CV00134 WRW

WAL-MART STORES, INC;
WAL-MART TRANSPORTATION LLC                                                    DEFENDANTS

## ORDER

Pending is Plaintiffs' Motion to Compel (Doc. No. 81). Defendants have responded (Doc. No. 83). The parties also have submitted letters to the Court concerning two other discovery issues.

First, Plaintiffs have served Defendants with a 30(b)(6) notice of deposition related to Defendants' distribution centers, which Defendants have objected to on the grounds that the Court has still not decided Plaintiffs' April 2006 Motion to Compel.

Second, Plaintiffs seek the application files for all the over-the-road truck drivers hired at 22 of the transportation offices during the period of 2000 to the present. Because both of those requests involve information relevant to the plaintiffs' claims, the requests are granted.

I.      BACKGROUND

Plaintiffs challenge Wal-Mart's hiring practices for over-the-road truck drivers for its transportation offices. The core issue in the motion to compel and the follow-up letters is

whether the scope of discovery to be expanded into Wal-Mart's hiring practices at its distribution centers.

Wal-Mart's Logistics Division[1] is divided into two subdivisions: (1) the Transportation Division in charge of Wal-Mart's truck fleet and its support; and (2) the Distribution Division in charge of the distribution centers that the trucking fleet services. There are 41 field transportation offices in Wal-Mart's Transportation Division.[2] Every transportation office is located onsite at one of the distribution centers it services.[3] The transportation offices have their own management structure, including a general transportation manager in charge of each office and a personnel manager who, together with the general transportation manager, is responsible for hiring over-the-road truck drivers.[4] The general transportation manager and personnel manager report to regional managers, who in turn report to either the East or West Transportation Division Vice President.[5] Those Vice Presidents report to the Senior Vice President of Transportation, who reports directly to the Executive Vice President of Logistics.[6]

The distribution centers are under the Distribution Division. They have a managerial structure apart from the transportation offices and report to a chain of higher-ups separate from

---

[1]This division is also referred to as the Transportation/Warehousing Division. *See* Doc. No. 83 at 3.

[2]Doc. No. 72 at 5-6.

[3]Doc. No. 77-8 at 23.

[4]Doc. No. 63-2 at 11; Do c. No. 77-8 at 17-19.

[5]Doc. No. 77-8 at 28-29.

[6]Doc. No. 77-10.

the transportation offices.[7]  Each distribution center, for instance, has a general manager who reports to a regional vice president for the distribution centers.[8]  The distribution centers, like the transportation offices, are ultimately accountable to the officers of the Logistics Division.

Wal-Mart's Diversity Office—a corporate-level office—has established Diversity Goals for the Logistics Division.  For the transportation offices, the general transportation managers must meet good faith efforts, i.e. set up a diversity mentoring program and go to three diversity conferences a year.[9]  In contrast, the general managers of the distribution centers, while having to meet good faith efforts, also have diversity hiring goals for entry-level warehouse positions.[10]  Edward Parrish, the human resources director for the Transportation Division, recommended that Wal-Mart set diversity hiring goals for truck drivers in the transportation offices, but that recommendation was summarily rejected.[11]

In the Motion to Compel, Plaintiffs asked for information on the diversity hiring goals for positions in the distribution centers, how those goals were developed, how Wal-Mart determines that those goals are met, the starting salary and benefits package for each of those positions, and electronic data related to those positions including name, address, race data, hire date, age data, address, and employment location.  Defendants objected to providing that information.  On May 4, 2006, Defendants were directed to provide Plaintiffs with a definitive statement describing

---

[7]Doc. No. 77-8 at 28-29.

[8]*Id*. at 29.

[9]Class Cert. Hrg. Tr. at 26-27.

[10] *Id*. at 23, 26-27.

[11]Pl. Class Cert. Ex. 45 at 47-49.

whether the warehouse operations of Wal-Mart's Logistics Division have conducted studies setting forth the racial makeup of its warehouse workforce; whether Wal-Mart has established numeric or other goals relating to the warehouse workforce; and whether Wal-Mart has conducted any studies or investigations related to relevant census data concerning the warehouse operations. Wal-Mart responded to that order by stating that it had not conducted any "non-privileged" studies setting forth the racial makeup of its warehouse workforce[12]; that it had established goals relating to entry-level positions at its distribution centers from May 31, 2004, to October 31, 2004, and from November 1, 2004, to October 31, 2005; and that it had not conducted any studies or investigations related to relevant census data concerning warehouse operations.[13]

## II.    ANALYSIS

Resolution of discovery issues are within the sound discretion of the district court, reviewable only for abuse of discretion.[14] Under Federal Rule of Civil Procedure 26(b)(1), parties may obtain discovery regarding any nonprivileged matter that is "relevant to the claim or defense" of any party.

---

[12] Wal-Mart did state that it prepared and filed with the EEOC EEO-1 reports that set forth the racial breakdown of employees grouped by job categories such as officials and managers, professionals, technicians, operatives (semi-skilled), and laborers (unskilled).

[13] Wal-Mart did state that it compared the job duties and requirements of the selected warehouse positions to the descriptions of census codes in developing the numeric goals applicable to the hourly warehouse workforce.

[14] *Roberts v. Shawnee Mission Ford, Inc.*, 352 F.3d 358, 360 (8th Cir. 2003).

**A.     30(b)(6) Deposition**

Plaintiffs seek similar information from Wal-Mart in their 30(b)(6) Notice of Deposition as was sought in the Motion to Compel. Plaintiffs ask Wal-Mart to designate a person to testify on the following topics:

- All studies that Wal-Mart has conducted setting forth the racial or other demographic makeup of its warehouse workers;

- The numeric and other goals relating to the warehouse workforce dealing specifically with the hiring of the most commonly hired entry-level positions at its distribution centers during the period of May 31, 2004, to the present;

- Comparisons conducted by Wal-Mart of the job duties and requirements of selected warehouse positions to the descriptions of census codes in developing the numeric goals applicable to the hourly warehouse workforce;

- All documents related to Defendants' Statement in Response to May 4, 2006, Order; and

- All persons who provided information relevant to Defendants' Statement in Response to the May 4, 2006 Order.

Plaintiffs assert that this information is relevant to Plaintiffs' claims because it may shed light on Wal-Mart's intent. A plaintiff must show that the defendant "purposefully" discriminated to prevail on a claim alleging a pattern and practice of employment discrimination.[15] Similarly, "malice or reckless indifference" is required for punitive damages to issue in a Title VII case.[16] Here, the same corporate-level office sets diversity goals for the Logistics Division, of which both the Transportation Division and the Distribution Division are parts. Plaintiffs contend that any evidence as to why Wal-Mart's Diversity Office has set

---

[15]*Morgan v. United Parcel Serv. of Am., Inc.*, 380 F.3d 459, 463 (8th Cir. 2004).

[16]42 U.S.C. § 1981a(b)(1).

diversity hiring goals for entry-level positions at the distribution centers but not for truck drivers will be evidence of Wal-Mart's intent for purposes of the plaintiffs' claims.

Defendants, however, argue that the information on warehouse employees sought by the plaintiffs bears no relation to the hiring of truck drivers because that is done by separate managers in a completely distinct subdivision.  They cite *Sallis v. University of Minnesota*,[17] a Title VII race discrimination case where the Eighth Circuit held that the district court did not abuse its discretion by denying the plaintiff's discovery requests where the personnel complaints the plaintiff requested from the defendant's central database did not involve the plaintiff's supervisors.  *Sallis* is not on point.

In *Sallis* the actions of supervisors in other departments had no bearing on whether the plaintiff was discriminated against by his supervisors, while here the diversity policies for the entire Logistics Division, of which both the transportation offices and distribution centers are parts, are set by the same corporate-level office.  Wal-Mart's Diversity Office could have set the same diversity goals for over-the-road truck drivers as it did for entry-level warehouse employees, but did not. Similarly, if the Diversity Office studied the racial demographics for the entry-level warehouse employees it could also could have studied the racial demographics for its over-the-road truck drivers.  Why the Diversity Office set such diversity goals and may have conducted studies of the racial makeup of its warehouse workforce is therefore much more relevant to the plaintiffs' claims than the complaints against supervisors outside the plaintiff's department in *Sallis*, as any discovery about the hiring goals for warehouse workers and studies

---

[17]408 F.3d 470, 477-78 (8th Cir. 2005).

of the warehouse workers' racial makeup may shed light on what Wal-Mart knew and could have implemented for over-the-road truck drivers.[18]

### B.      Application Files

Plaintiffs requests application files for all the over-the-road truck drivers hired at the 22 transportation offices,[19] where Plaintiff Tommy Armstrong applied.[20]  It seems to me that the application files Plaintiffs request are directly relevant to Armstrong's claims, regardless of whether class certification is granted..

Armstrong alleges that he was discriminated against because of the practice of "word of mouth" hiring.[21]  Reviewing the application files for the 22 offices in which he applied would either confirm or cast doubt upon that allegation.  Furthermore, Wal-Mart has already produced application files for 12 transportation offices, so they would only have to produce application files for the remaining 10 transportation offices.  As Plaintiffs state in their November 7, 2006 letter, "For a case of this complexity, this is far from an overly burdensome production."

---

[18] Some of the previous filings indicate that Wal-Mart has argued that Wal-Mart Transportation LLC is a separate entity apart from Wal-Mart Stores, Inc. *See* Doc. No. 81-2 at 4. However, Wal-Mart has not raised that argument in this context.

[19] There is a discrepancy between the plaintiffs' November 3, 2006 and November 7, 2006 letters.  The November 3, 2006 letter says that Armstrong applied to 21 transportation offices, while the November 7 letter says that he applied to 22 transportation offices.

[20] Plaintiffs originally sought all the application files at all the transportation offices, but have since proposed a compromise of only the application files at the 22 transportation offices at which Armstrong applied.  Plaintiffs will wait on requesting the application files of the other transportation offices until after the Court has ruled on its motion for class certification.

[21] Plaintiffs allege that the defendants recruited new truck drivers by having its current drivers pass out cards with a 1-800 number to call for an application.  Plaintiffs allege that Wal-Mart knew that its body of current drivers was predominantly white and that the practice of having current drivers distribute the 1-800 number was therefore discriminatory.

## CONCLUSION

Based on the findings of fact and conclusions of law above, Plaintiffs' Motion to Compel is GRANTED. Additionally, because granting the plaintiffs' request for a 30(b)(6) deposition concerning the diversity goals and racial makeup of the warehouse workers at Wal-Mart's distribution centers involves the same issues as Plaintiffs' motion to compel, i.e. whether to expand the scope of discovery to encompass the diversity goals and any racial studies of Wal-Mart's warehouse workforce, Defendant should make a representative available for a 30(b)(6) deposition.

The parties are reminded that they should comply with the protective order when exchanging and reviewing any "sensitive" information regarding personnel files and other documents.[22]

IT IS SO ORDERED this 20th day of November, 2006.

/s/ Wm. R.Wilson,Jr.
UNITED STATES DISTRICT JUDGE

---

[22]Doc. No. 45 at 2.