**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**EASTERN DIVISION**

**DARYAL T. NELSON and TOMMY**
**ARMSTRONG, individually and on**
**behalf of all persons similarly situated**                                    **PLAINTIFFS**

**V.**                                            **No: 2:04CV00171 WRW**
                                            **No: 2:05CV00134 WRW**

**WAL-MART STORES, INC; and**
**WAL-MART TRANSPORTATION LLC**                                    **DEFENDANTS**

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR**
**CLASS CERTIFICATION**

Pending is Plaintiffs' Motion for Class Certification,[1] to which Defendants have

responded.[2]  A Class Certification Hearing was held May 31, 2006.  After the hearing, both

parties submitted proposed findings of fact and conclusions of law.[3]  I submitted additional

questions to the parties, and held another hearing, on April 24, 2007, on the motion to certify the

class.  For the reasons below, Plaintiffs' Motion for Class Certification is GRANTED in part and

DENIED in part.

---

[1]Doc. No. 54.  For purposes of this Opinion and Order, "Doc. No." refers to the CM/ECF
docket entry number, while "Pls.' Ex." (or "Defs.' Ex.") refers to the number of the exhibit to the
class certification motion (or response to the class certification motion) submitted by the
respective party.

[2]Doc. No. 64.

[3]Doc. Nos. 105; 106.

I.     BACKGROUND

Plaintiffs Tommy Armstrong and Daryal T. Nelson are African American truck drivers who applied for positions as over-the-road truck drivers at transportation offices operated by Defendant Wal-Mart Transportation LLC, a wholly owned subsidiary of Defendant Wal-Mart Stores, Inc. (collectively "Wal-Mart"), but were rejected.  This case challenges Wal-Mart's hiring practices for over-the-road truck drivers.

Wal-Mart's Logistics Division is divided into two subdivisions: (1) the Transportation Division in charge of Wal-Mart's truck fleet and its support; and (2) the Distribution Division in charge of the distribution centers that the trucking fleet services.[4]  Wal-Mart's Transportation Division includes approximately 8,000 drivers, in 47 field transportation offices nationwide, who deliver goods and products to Wal-Mart stores and Sam's Clubs across the country.[5]  Every transportation office is located on-site at one of the distribution centers it services.[6]  The transportation offices have their own management structure, including a general transportation manager in charge of each office and a personnel manager who, together with the general transportation manager, is responsible for hiring over-the-road truck drivers.[7]  The general transportation manager and personnel manager report to regional managers, who in turn report to either the east or west vice president of the Transportation Division.[8]  Those vice presidents

---

[4]Doc. No. 82 at 3.

[5]*See* Defs.' Ex. 24 ¶ 4.  Counsel stated at the hearings that Wal-Mart now has 47 transportation offices.

[6]Doc. No. 77-9 at 23.

[7]Doc. Nos. 63-2 at 11; 77-9 at 17-19.

[8]Doc. No. 77-9 at 28-30.

report to the senior vice president of the Transportation Division, who reports directly to the executive vice president of the Logistics Division.[9]

Each over-the-road truck driver is assigned to a transportation office.[10]  Every transportation office, with minor exceptions, has the same management positions and internal reporting hierarchy.[11]  Wal-Mart fosters a uniform corporate culture by the frequent transfer of managers from one transportation office to another as well as by training managers in transportation offices other than those to which they will ultimately be assigned.[12]

Wal-Mart's field transportation operations are divided into ten regions.[13]  Each region has an identical management organization, including a regional transportation manager and a regional people manager.[14]  All regional managers are centrally based at Wal-Mart's headquarters in Bentonville.[15]  The regional managers travel to the transportation offices in their region from Tuesday through Thursday and are back in Bentonville on Monday and Friday.[16] The managers in the transportation offices report directly to the regional managers.[17]

---

[9]Doc. No. 77-11.

[10]Pls.' Ex. 3.

[11]Pls.' Exs. 5 at 17-19; 7 at 20-21.

[12]*See, e.g.*, Pls.' Exs. 12 at 32-34; 13 at 8-12; 14 at 10.

[13]Pls.' Ex. 3.

[14]Pls.' Ex. 5 at 28-30.

[15]*Id*. at 39.

[16]*Id.* at 39-40.

[17]Pls.' Ex. 8.

All hiring and personnel policies for the transportation offices are developed at and disseminated from Wal-Mart's central headquarters in Bentonville.  The corporate-level Human Resources Department develops the human resource policies that apply throughout Wal-Mart.[18] The corporate-level Diversity Office develops, coordinates, and monitors all of Wal-Mart's diversity initiatives.[19]  Ed Parrish, the director of people for Wal-Mart's Transportation Division, develops all the hiring and personnel policies specific to the Transportation Division.[20]  These policies are disseminated nationwide to the regions and individual transportation offices through an online database.[21]  Neither regional managers nor managers at individual transportation offices have the authority to develop personnel or hiring policies that diverge from the corporate policies developed in Bentonville.[22]

The primary elements of the hiring process for drivers at every transportation office are identical.  First, new drivers are recruited almost exclusively through the "word of mouth" of current Wal-Mart drivers.[23]  Wal-Mart implements the word-of-mouth recruitment by providing

---

[18]Pls.' Ex. 7 at 10-12.

[19]*Id*. at 38.

[20]*Id*. at 9-10, 152.

[21]*Id*. at 145-46, 152.

[22]*Id*. at 151-52.

[23]While Wal-Mart vigorously disputes that fact, it is amply supported by Wal-Mart's own admission in an answer to one of Plaintiffs' interrogatories as well as the corporate memos and presentations and deposition testimony of Wal-Mart's own employees.  *See* Pl. Exs. 9 at 6 (interrogatory response no. 4); 7 at 46-48, 180-81, 184, 194, 197, 204-05; 10 at 745; 11 at 4; 12 at 44-48; 13 at 28-30; 15 at 33-34; 16 at 52; 20 at 10-14; 21 at 12, 44, 47-48; 22 at 269; 83 at 15-16, 58.

its current drivers with a "1-800 card" to pass out to prospective applicants.[24]  The card lists the

minimum driver qualifications and a 1-800 number drivers can call to request an application.[25]

Both the minimum qualifications and the application are the same nationwide.[26]  All 1-800 cards

are designed and printed at the Bentonville headquarters.[27]  Wal-Mart does little, if any, job

advertising in addition to their drivers disseminating the 1-800 card.[28]

All who call the 1-800 number, regardless of which transportation office they wish to

apply, are initially processed and screened at Wal-Mart's Bentonville headquarters.[29]  An

application is then sent to the potential applicant.[30]  The applicant is instructed to return the

completed application to the Bentonville headquarters.[31]  If the application is completed, the

minimum requirements are met, and the applicant's preferred transportation office is currently

hiring, the application is forwarded to the appropriate transportation office.[32]  In some cases, an

applicant may send the application directly to the transportation office, in which case the clerk at

the transportation office conducts the initial screening process.[33]

---

[24]Pls.' Ex. 9 at 6.

[25]*Id.*

[26]*See* Pls.' Ex. 7 at 49, 58.

[27]*Id.* at 49-50.

[28]*Id.* at 180-81; *see also* Pls.' Exs. 23; 24.

[29]Pls.' Exs. 28; 29.

[30]*Id.*

[31]*Id.*

[32]*Id.*

[33]Pls.' Ex. 7 at 72-75.

After the application is forwarded from the Bentonville headquarters, a screening committee, consisting of current drivers at the transportation office, decides which applicants will be granted an interview.[34]  The same screening committee of current drivers also interviews those applicants who make the initial screening cut.[35]  Those applicants who are recommended by the screening committee are then interviewed by a management committee, which must include the general transportation manager and the personnel manager.[36]  The general transportation manager of the transportation office for which the applicant applied makes the final hiring decision.[37]  No other position within the Transportation Division utilizes a hiring process involving word-of-mouth recruitment, a centralized 1-800 number, or employee screening committees.[38]

Beyond the minimum qualifications, Wal-Mart has no written or objective criteria to guide the driver screening committees when analyzing applicants during the hiring process.[39] The hiring discretion of the general transportation managers is similarly unfettered by any objective criteria.[40]  Wal-Mart does not track, evaluate, or analyze what subjective criteria its

---

[34]Pls.' Ex. 31.

[35]*Id.*

[36]*Id.*

[37]Pls.' Ex. 7 at 127.

[38]*Id.* at 153-54.

[39]*Id.* at 80-89.

[40]*Id.* at 127.

drivers and managers are utilizing during the recruitment and hiring process.[41]  While Wal-Mart policy requires each driver screening committee to be 50% diverse,[42] a review of all of Wal-Mart's regional personnel manager audits reveals that no screening committee has a majority of African Americans and that a substantial percentage of the screening committees do not have any African American representation whatsoever.[43]  Plaintiffs have presented evidence of some of the subjective factors employed by the screening committees to determine which applicants make the interview cut,[44] as well as anecdotal evidence of overt racism among screening committee members.[45]

From January 1, 2000, to September 19, 2005, Wal-Mart hired 4,135 over-the-road truck drivers.[46]  Wal-Mart's workforce of over-the-road truck drivers during that time ranged from approximately 4% to 6% African American and the new hires during that period approximately 7.4% African American.[47]  During the same time period, a study by the American Trucking Association determined that approximately 15% of the nationwide truck-driver workforce was African American.[48]  Utilizing census data and EEOC data, Plaintiffs' expert Dr. Martin Shapiro

---

[41]*Id.* at 54, 89, 127.

[42]Pls.' Ex. 45 at 76-77.

[43]Pls.' Ex. 43.

[44]*See, e.g.*, Pls.' Exs. 20 at 30; 21 at 34-35; 65 ¶ 7; 71 ¶ 9; 80 ¶ 7.

[45]Pls.' Exs. 94 at 90; 95 at 94-95, 119, 149-50; 96 at 61-73.

[46]Defs.' Ex. 32-3 at 4.

[47]Defs.' Ex. 32-1 at 7.

[48]Pls.' Ex. 102.

determined that from January 1, 2000, to September 19, 2005, the proportion of newly hired African American drivers was less than the expected proportion of newly hired African American drivers in 34 of the 39 transportation offices.[49]

In 1999, Kevin Upham, the driver recruitment coordinator, undertook a detailed evaluation of Wal-Mart's current recruiting practices.[50]  Upham concluded that the exclusive reliance on word-of-mouth hiring practices was greatly limiting publicity of job openings for over-the-road truck drivers.[51]  He recommended to management that steps be taken to publicize job openings to the general trucking community.[52]  Wal-Mart did not adopt Upham's proposals,[53] and eliminated the driver recruitment position.[54]

Wal-Mart revived the recruitment position in 2004 and placed Frank Paris in that position.[55]  Paris investigated Wal-Mart's recruitment practices and, in an August 2004 memo and Powerpoint presentation, reached almost the same conclusions as Upham about the impact of Wal-Mart's reliance on word-of-mouth recruiting.[56]  Wal-Mart made no changes to its hiring policies in response to Paris's investigation.

---

[49]*See* Pls.' Ex. 93 at A-3.

[50]Pls.' Ex. 10.

[51]*See id.* at 745.

[52]*Id.*

[53]Pls.' Ex. 7 at 183-85.

[54]*Id.* at 195.

[55]*Id.*

[56]Pls.' Ex. 11 at 4; *see also* Pls.' Exs. 22 at 269; 7 at 200-201.

Wal-Mart has the ability to generate and retain complex demographic data and other statistical information.[57]   Yet Wal-Mart rejected two proposals to track the racial demographics of its applicant pool for over-the-road truck drivers.[58]   In fact, Wal-Mart has never analyzed the causal connection between its reliance on word-of-mouth recruiting and the number of African Americans in its workforce of over-the-road truck drivers, despite the acknowledgment by Ed Parrish – Wal-Mart's top human resources officer in the Transportation Division and chosen corporate representative in this suit – that word-of-mouth recruiting leads to a perpetuation of the current demographics in the workforce.[59]

## II.   CERTIFICATION UNDER RULE 23(A)

Plaintiffs seek to certify a class consisting of:

a. African American persons who reside in the continental United States of America who have applied for employment as over-the-road truck drivers at Wal-Mart since September 22, 2001, and who have not been hired; and

b. African American persons who reside in the continental United States of America who were deterred or thwarted from applying for positions as over-the-road truck drivers at Wal-Mart due to Wal-Mart's challenged policies and practices.[60]

To obtain class certification, Plaintiffs must meet all four requirements of Federal Rule of Civil Procedure 23(a) and the requirements of at least one of the subdivisions of Rule 23(b).  A case is "not maintainable as a class action by virtue of its designation as such in the pleadings."[61]

---

[57]*See* Pls.' Exs. 45 at 28-29; 58.

[58]Pls.' Exs. 45 at 25-26, 49-54; 46; 48.

[59]Pls.' Ex. 7 at 207-08.

[60]Doc. No. 105 at 9.

[61]*In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

Instead, "[t]here must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled."[62]  The party seeking class certification has the burden of establishing that certification is appropriate.[63]

The decision whether to certify a class action is left to the sound discretion of the district court.[64]  In determining whether to certify a class action, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."[65]  "Accordingly, while the Court must conduct a 'rigorous analysis,' class certification is a procedural determination and should not include an inquiry into the merits."[66]  The Court's duty to assure compliance with Rule 23 continues even after the certification.[67]

---

[62]*Id.*

[63]*Coleman v. Watt*, 40 F.3d 255, 259 (8th Cir. 1994).

[64]*Id.*

[65]*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974).

[66]*Mehl v. Canadian Pac. Ry. Ltd.*, 227 F.R.D. 505, 509 (D.N.D. 2005) (citation omitted).

[67]*See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

A.      **Implicit Requirement for Class Certification**

While not explicitly listed in Rule 23(a), some courts have required that a precisely

defined class exist before considering the Rule 23(a) criteria for class certification.[68]  Wal-Mart

argues that including all African Americans who were deterred or thwarted from applying to the

proposed class renders the class too imprecise and speculative to be certified.

The Supreme Court has held that, in certain situations, deterred applicants are entitled to

relief under Title VII.[69]  According to the Supreme Court,

> [t]he effects of and the injuries suffered from discriminatory employment practices
> are not always confined to those who were expressly denied a requested employment
> opportunity.  A consistently enforced discriminatory policy can surely deter job
> applications from those who are aware of it and are unwilling to subject themselves
> to the humiliation of explicit and certain rejection.
>
> If an employer should announce his policy of discrimination by a sign reading
> "Whites Only" on the hiring-office door, his victims would not be limited to the few
> who ignored the sign and subjected themselves to personal rebuffs. The same
> message can be communicated to potential applicants more subtly but just as clearly
> by an employer's actual practices – by his consistent discriminatory treatment of
> actual applicants, by the manner in which he publicizes vacancies, his recruitment
> techniques, his responses to casual or tentative inquiries, and even by the racial or
> ethnic composition of that part of his work force from which he has discriminatorily
> excluded members of minority groups. When a person's desire for a job is not
> translated into a formal application solely because of his unwillingness to engage in
> a futile gesture he is as much a victim of discrimination as is he who goes through
> the motions of submitting an application.[70]

Where, as here, the employment practice complained of involves word-of-mouth recruitment,

courts have often included deterred and thwarted applicants in the class challenging such a

---

[68]*Dirks v. Clayton Brokerage Co. of St. Louis Inc.*, 105 F.R.D. 125, 130 (D. Minn. 1985)
(citing *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir. 1976)).

[69]*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977).

[70]*Id*. at 365-66.

practice.[71]  Indeed, inclusion of deterred and thwarted applicants seems most appropriate in the context of word-of-mouth practices, since the nature of word-of-mouth recruiting is to prevent members of a protected class from even knowing about employment opportunities.

Wal-Mart in its surreply vigorously contests Plaintiffs' characterization of Wal-Mart's driver recruitment practices as "word of mouth."  Instead, Wal-Mart chooses to characterize driver hiring as "a more formal hiring process with many objective components."[72]  Wal-Mart points to the existence of minimum job qualifications and a formal application process as proof that its characterization is correct.  At this stage in the litigation, however, where I am not allowed to inquire into the merits of Plaintiffs' claims,[73] Plaintiffs have presented sufficient evidence to support their characterization of the recruitment process as word-of-mouth.  Wal-Mart concedes that its primary means of driver recruitment is through its current drivers – who, based on evidence presented by Plaintiffs, are disproportionately white[74] – passing out cards with

---

[71]*See, e.g.*, *Catlett v. Mo. Highway & Transp. Comm'n*, 828 F.2d 1260, 1262 (8th Cir. 1987) (class of females "who applied or might have applied for maintenance positions" with the defendant); *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1433, 1442 (9th Cir. 1984) (class of all nonwhites who "were employed by Nefco, applied for employment with Nefco, or were deterred from applying for employment with Nefco"); *Bibbs v. Jernberg Indus., Inc.*, No. 93 C 0637, 1993 WL 535338, at *3 (N.D. Ill. Dec. 17, 1993); *Van v. Plant & Field Serv. Corp.*, 672 F. Supp. 1306, 1308 (C.D. Cal. 1987) (class of all women who were past or present applicants for hire or were deterred from applying); *Kraszewski v. State Farm Gen. Ins. Co.*, No. C 79-1261, 1985 WL 1616, at *78, *80 (N.D. Cal. Apr. 29, 1985) (class consisting of all "female applicants and deterred applicants"); *Pollar v. Judson Steel Corp.*, No. C-82-6833, 1984 WL 968, at *3 (N.D. Cal. Mar. 30, 1984) ("female applicants and deterred female applicants");

[72]Defs.' Surreply at 7.

[73]The Supreme Court was unmistakably clear in *Eisen* that "nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen*, 417 U.S. at 177.

[74]*See* Pls.' Exs. 2; 57.

the 1-800 number for applications.[75]  Plaintiffs also have presented evidence that Wal-Mart's white drivers mainly refer only other white drivers.[76] Such evidence is consistent with what courts have understood to be the tendency of word-of-mouth recruiting.[77]  Whether Wal-Mart actually engaged in impermissible word-of-mouth recruiting will be best resolved in a motion for summary judgment, or in a trial on the merits.  However, Plaintiffs have presented sufficient evidence to raise an inference that Wal-Mart's practices are word-of-mouth recruiting as that term has been recognized by other courts.

While some courts have excluded deterred applicants from class participation out of fear that the class size will become unlimited or unwieldy,[78] such concerns are not present here.  The proposed class of deterred applicants is limited to African Americans possessing sufficient experience and training to meet Wal-Mart's minimum qualifications for over-the-road truck drivers but who were deterred or thwarted, because of Wal-Mart's reliance on word-of-mouth recruitment, from making timely applications for employment.  While that may be a few

---

[75]Pls.' Exs. 7 at 180, 184, 195, 197; 9 at 6.

[76]*See* Pls.' Exs. 71 ¶ 6; 77 ¶ 6; 16 at 55; 68 ¶ 8; 70 ¶ 7; 79 ¶ 9.

[77]*See, e.g.*, *Parham v. Sw. Bell Tel. Co.*, 433 F.2d 421, 426-27 (8th Cir. 1970).

[78]For example, the court in *Harris v. General Development Corporation*, 127 F.R.D. 655 (N.D. Ill. 1989), addressed the inclusion of deterred applicants in an employment class action:
> In certain cases . . . class identification would be entirely feasible.  For example, a class comprised of current employees who were "chilled" from applying for a promotion is relatively limited, readily identifiable, and capable of more accurate verification.  In contrast to that situation, plaintiffs' class of deterred applicants encompasses the entire available black labor force in the City of Chicago and its contiguous suburbs.  In attempting to cull the truly deterred applicants from such an expansive universe, a tremendous amount of valuable court time and resources would be consumed, placing a severe burden on the court and litigants.

*Id*. at 659 (citation omitted).

hundred, or even a few thousand, class members, it is far cry from the sheer magnitude of potential class members that has given other courts pause in determining whether to allow deterred applicants to participate in the class.[79]  I find that Plaintiffs have presented a sufficiently precise class definition to meet the implied requirement of Rule 23(a).

### B.     Numerosity

Since it is undisputed that the class is "so numerous that joinder of all members is impracticable," I find that Plaintiffs have met Rule 23(a)(1)'s numerosity requirement.

### C.     Commonality

Rule 23(a)(2) requires that there be common questions of law or fact among the members of the class.[80]  Class certification is "particularly appropriate" when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class.[81]  While allegations of across-the-board discrimination will not satisfy the burden of proof on certification, evidence that an employer operated under a general policy of discrimination which manifested itself to all class members "in the same general fashion, such as through entirely subjective decisionmaking processes," suffices to show commonality.[82]  "[C]ourts have made it clear that in cases alleging classwide disparate treatment

---

[79]*See id.* (entire available black labor force in the City of Chicago); *see also Sondel v. Nw. Airlines, Inc.*, No. 3-92-381, 1993 WL 559031, at *4 (D. Minn. Sept. 30, 1993) (finding that the proposed sub-class of deterred applicants was the equivalent of a "substantial percentage of the nation's female work force").

[80]*Paxton*, 688 F.2d at 561.

[81]*Falcon*, 457 U.S. at 155.

[82]*Id.* at 159 n.15.

in particular employment actions, plaintiffs must show a company-wide policy or practice, beyond individualized claims of discrimination."[83]

Plaintiffs argue that commonality is met because all class members are over-the-road truck drivers who have been affected by the excessive subjectivity of Wal-Mart's uniform hiring policies.  I am satisfied that there are common questions of law and fact with respect to the class and its representatives.  Plaintiffs do not seek to certify a class challenging across-the-board discrimination for a broad range of jobs across several departments,[84] but rather focus specifically on the hiring policies for the single position of over-the-road truck driver in Wal-Mart's Transportation Division.

"[I]t is uniformly held that plaintiffs seeking class certification may represent a multi-facility class only where centralized and uniform employment practices affect all facilities the same way."[85]   For purposes of this stage of the litigation, Plaintiffs have established uniform hiring policies affecting all African American over-the-road truck drivers who met the minimum

---

[83]*Abrams v. Kelsey-Seybold Med. Group, Inc.*, 178 F.R.D. 116, 129 (S.D. Tex. 1997).

[84]*Cf. Falcon*, 457 U.S. at 152 (describing "across-the-board" challenge to defendant's employment practices involved in the case); *Bradford v. Sears, Roebuck, & Co.*, 673 F.2d 792, 794-95, 796 (5th Cir. 1982) (challenging hiring, firing, pay, and promotion practices across all of defendant's job classifications in the state of Mississippi); *Yapp v. Union Pac. R.R. Co.*, 229 F.R.D. 608, 610 (E.D. Mo. 2005) (challenging selection practice for non-union positions across all of the defendant's departments); *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 141, 146 (N.D. Cal. 2004) (challenging the pay and promotion practices across several departments and numerous job classifications); *Clayburne v. Omaha Pub. Power Dist.*, 211 F.R.D. 573, 578 (D. Neb. 2002) (challenging promotion, pay, training, and performance-evaluation practices for positions companywide); *Wright v. Circuit City Stores, Inc.*, 201 F.R.D. 526, 528, 531 (N.D. Ala. 2001) (challenging promotion assignment, training, and transfer practices across multiple positions and departments); *Bacon v. Honda of Am. Mfg., Inc.*, 205 F.R.D. 466, 477 (S.D. Ohio 2001) (seeking to certify class "consisting of every African American who has ever been employed at the Ohio Honda facilities").

[85]*Clayborne*, 211 F.R.D. at 595.

requirements and applied, or were deterred from applying, to Wal-Mart in a similar manner.
Plaintiffs presented evidence that, while Wal-Mart does not have a centralized decisionmaking
body that makes each driver hiring decision, Wal-Mart does have uniform policies, procedures,
and practices that control the hiring process for over-the-road truck drivers.

Plaintiffs have produced evidence of hiring practices promulgated by Wal-Mart's central
office in Bentonville that each transportation office must follow.  These practices include relying
primarily on current drivers to solicit potential applicants for driver positions through
distribution of the 1-800 cards; entrusting current drivers to conduct both the initial screening to
determine which applicants will be granted an interview and the initial interview; and entrusting
the final stage of interviews and the ultimate hiring decision to the general transportation
managers.  Plaintiffs have produced evidence that Wal-Mart has not established any objective
hiring criteria besides the minimum qualifications printed on the 1-800 cards to guide the
decisionmakers at any step of the hiring process.  Consequently, drivers and general
transportation managers are free to apply subjective and idiosyncratic factors in deciding which
applicants are hired.  Plaintiffs have produced evidence that the application of such subjective
factors has led to statistically significant under-representation of African American over-the-road
truck drivers in Wal-Mart's work force.  Plaintiffs have produced evidence that, although Wal-
Mart was aware of both the potential for its hiring process to produce this disparity and had the
means to attempt to correct the disparity, Wal-Mart did nothing to change its hiring policies.

This evidence presented by Plaintiffs demonstrates the existence of common issues of
fact and law to be decided at trial (if not on Wal-Mart's motion).  Plaintiffs will have to establish
that Wal-Mart's hiring policies and practices were indeed uniform throughout Wal-Mart's

transportation offices and that they caused African Americans to be hired less often as over-the-road truck drivers than similarly situated whites.  They will have to demonstrate that Wal-Mart's driver hiring policy for the Transportation Division caused a pattern or practice of discrimination against African American over-the-road truck drivers in violation of Title VII and § 1981.  They also must show that Wal-Mart's driver hiring policy violated Title VII by having a disparate impact on African American over-the-road truck drivers – a disparate impact not justified by a business necessity.  Resolving these factual and legal questions will involve the same evidence for all class members.

Wal-Mart asserts several reasons as to why Plaintiffs' proposed class cannot meet the commonality requirement, none of which are persuasive.  First, Wal-Mart argues that commonality is defeated because of the variations in qualifications and experience among the class members.  Wal-Mart cites several cases to support its argument.  Those cases all stand for the unremarkable proposition that, absent a showing of a pattern or practice of discrimination common to the class, "[d]iscrimination based solely on membership in a protected class [w]hich manifests itself in a different set of facts for each employee is not enough to satisfy the commonality requirement."[86]  However, Plaintiffs have presented evidence of uniform hiring policies, developed by a centralized authority, which affect all class members in a similar way.  Thus, the factual differences in Plaintiffs' claims that Wal-Mart points out – such as different

---

[86]*Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 427 (N.D. Ill. 2003) (internal quotation omitted); *see also Skipper v. Giant Food Inc.*, 68 Fed. Appx. 393, 397 (4th Cir. 2003) ("Given the nature of the claims plaintiffs have pressed, the facts will vary widely from worker to worker in cases of disparate treatment, and they will vary widely from warehouse to warehouse in cases of a hostile work environment."); *Johnson v. U.S. Beef Corp.*, No. 04-0963, 2006 WL 680918, at *4 (W.D. Mo. Mar. 14, 2006) (noting that "plaintiffs have failed to identify what policies or procedures they believe are discriminatory").

levels of experience and locations of interest – do not defeat the existence of common questions based on the effect of Wal-Mart's uniform hiring policies on African American over-the-road truck drivers.

Next, Wal-Mart argues that the evidence of significant variations in the hiring processes of the 47 individual transportation offices prevents a finding of commonality. For example, Wal-Mart points out that different general transportation managers and screening committees use different evaluation methods for driver candidates, some of which involve assessing objective qualifications.[87] However, as Plaintiffs correctly note in their reply,[88] all of the distinctions Wal-Mart lists are either immaterial or actually support Plaintiffs' contention that Wal-Mart has set up a driver-hiring process rife with subjectivity. Furthermore, the fact that some individual managers may actually use objective criteria does not defeat Plaintiffs' claim of excessive subjectivity. "[W]hat is significant is that the determination of which criteria to use is left entirely to the individual manager."[89]

That last point ties into Wal-Mart's third, and most substantial, argument against a finding of commonality here. Wal-Mart argues that commonality is defeated because, despite similar hiring policies, the hiring decisions are made independently by each general transportation manager. Wal-Mart cites numerous cases where other courts refused to grant certification when an employer "had a centralized policy of decentralization."[90] I am well aware

---

[87]Defs.' Resp. Br. at 23.

[88]Pls.' Reply Br. at 20.

[89]*McReynolds v. Sodexho Marriott Servs., Inc.*, 208 F.R.D. 428, 442 (D.D.C. 2002).

[90]Defs.' Resp. Br. at 28-29 (citing *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 670 (N.D. Ga. 2001)).

of the split among courts who view a policy of decentralized and subjective decisionmaking as

sufficient to support a finding of commmonality, and those who find that it defeats

commonality.[91]  Without hesitation, I agree with the former courts.  It is difficult to see why a

large corporation should not be held to account for instituting a centralized policy that harms a

class of individuals just because that policy allows managers to utilize subjective

decisionmaking.  As the court in *McReynolds* stated:

> This position [that a policy of decentralized decisionmaking defeats commonality]
> would permit companies to escape Title VII class actions by minimizing the amount
> of control that they exercise over individual managers.  Such a holding would run
> afoul of the purpose of Title VII, which is "not to provide redress but to avoid harm,"
> by encouraging employers "to adopt antidiscrimination policies and to educate their
> personnel on Title VII's prohibitions."[92]

The Ninth Circuit has made the same point: "The unsurprising fact that some employment

decisions are made locally [should] not allow a company to evade responsibility for its

policies."[93]

Nevertheless, even assuming that a centralized policy of decentralized, subjective

decisionmaking cannot by itself meet the commonality requirement for Rule 23, the unique

factual situation of this case makes a finding of commonality appropriate here.[94]  Although Wal-

---

[91]Melissa Hart, *Subjective Decisionmaking and Unconscious Discrimination*, 56 ALA. L. REV. 741, 787 (2005) (collecting cases).

[92]208 F.R.D. at 443 (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999) (internal quotation omitted)); *See generally* Daniel S. Klein, Note, *Bridging the* Falcon *Gap: Do Claims of Subjective Decisionmaking in Employment Discrimination Class Actions Satisfy the Rule 23(a) Commonality and Typicality Requirements?*, 25 REV. LITIG. 131, 152-165 (2006).

[93]*Staton v. Boeing Co.*, 327 F.3d 938, 956 (9th Cir. 2003).

[94]*See, e.g.*, *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1275-76 (11th Cir. 2000) (noting that most certification decisions turn on "case-specific matters of fact").

Mart's policy of subjective and decentralized decisionmaking is an important part of Plaintiffs'

claims, Plaintiffs do not argue that Wal-Mart should be liable just because they allowed its

general transportation managers discretion as to who they could hire.  Instead, Plaintiffs have

presented evidence that Wal-Mart's policy across all the transportation offices is to recruit new

drivers primarily through its current drivers by using the 1-800 card and driver screening

committees.  Plaintiffs also have presented statistical and anecdotal evidence to show that this

policy had a class-wide impact, preventing qualified African American truck drivers from getting

positions as over-the-road truck drivers at Wal-Mart.  Finally, Plaintiffs have produced evidence

that Wal-Mart was aware of  the potential for its hiring process to perpetuate the racial disparity

in its driver workforce but did nothing.  Combined, Plaintiffs' evidence raises an inference that

Wal-Mart excluded a cohesive group from the same opportunity by the intentional application of

the same policy.

Again, although Wal-Mart vigorously disputes the inferences to be drawn from Plaintiffs'

evidence and introduces its own evidence to counter Plaintiffs' claims, I note again that my task,

at this stage of the litigation, is not to determine the merits.[95]  It is sufficient that Plaintiffs'

evidence "at least suggest[s]" that Wal-Mart's hiring policies affected African American over-

the-road truck drivers in a similar way by routinely excluding them from hiring opportunities

with Wal-Mart.[96]  Plaintiffs have met that burden and satisfy the commonality requirement of

Rule 23.

---

[95]*Eisen*, 417 U.S. at 177-78.

[96]*Chaffin v. Rheem Mfg. Co.*, 904 F.2d 1269, 1276 (8th Cir. 1990).

### D.   Typicality

The Eighth Circuit has defined typicality as requiring "a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff."[97]  "A demonstration of typicality 'require[s] something more than general conclusory allegations that unnamed blacks have been discriminated against.'"[98] As courts have noted, the typicality and commonality requirements "tend to merge" because "[b]oth serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."[99]  The analysis of commonality presented above applies with equal force to typicality.  Plaintiffs have shown uniform hiring policies across the transportation offices that affect all class members in a similar manner.  The named plaintiffs' claims are typical of the class members' claims because they seek to challenge those policies.

Wal-Mart does make one argument specifically addressed to the typicality requirement. Wal-Mart argues that Plaintiffs cannot meet the typicality requirement because of the differing qualifications and factual circumstances of the named plaintiffs and the members of the proposed class.[100]  Because of these factual variations, Wal-Mart argues that it has unique defenses to many of the individual class members that makes class treatment inappropriate.  However, when a plaintiff challenges a corporate-wide policy of discrimination with regard to a specific

---

[97]*Id.* at 1275.

[98]*Id.* (quoting *Paxton*, 688 F.2d at 562).

[99]*Falcon*, 457 U.S. at 157 n.13.

[100]Defs.' Resp. Br. at 26.

employment practice, typicality is not defeated just because the named plaintiffs and individual class members have differing qualifications.[101]  As was explained above, Plaintiffs' claims are based on the same hiring policies and legal theories relevant to the class as a whole.[102]  While Wal-Mart's unique defenses may ultimately preclude some potential class members from recovering, they do not prevent the use of a class action to determine the central issue in this case: whether Wal-Mart's hiring policies for over-the-road truck drivers resulted in unlawful discrimination.

### E.    Adequacy of Representation

The fourth Rule 23(a) requirement requires that "a class representative . . . be part of the class and possess the same interest and suffer the same injury as the class members."[103]  This requirement "tend[s] to merge" with the commonality and typicality requirements because its purpose is to determine whether in a particular case "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."[104]  The adequacy

---

[101]*Paxton*, 688 F.2d at 562; *see also Donaldson v. Pillsbury Co.*, 554 F.2d 825, 831 (8th Cir. 1977) ("When the claim arises out of the same legal or remedial theory, the presence of factual variations is normally not sufficient to preclude class action treatment.").

[102]*Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996) ("Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory.").

[103]*East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (internal quotation omitted).

[104]*Falcon*, 457 U.S. at 157 n.13.

inquiry also factors in competency and conflicts of class counsel.[105]  Wal-Mart does not dispute

the competency or qualifications of Plaintiffs' counsel, nor does Wal-Mart argue that Plaintiffs'

counsel has any conflicts of interest.  Accordingly, I find class counsel qualified and competent

to prosecute this class action.

While Wal-Mart does not challenge the competency of Plaintiffs' counsel, Wal-Mart

does challenge the adequacy of the named plaintiffs to represent the class.  It makes three

arguments regarding the adequacy of the named plaintiffs.  First, Wal-Mart argues that Plaintiff

Armstrong is not an appropriate class representative because he did not verify that he met the

minimum qualifications to be hired as an over-the-road truck driver at Wal-Mart.[106]  Whether

Armstrong needed to verify that he met the qualifications, however, is hotly disputed.[107]

Because "the named plaintiff need not demonstrate a probability of success on the merits . . . to

serve as the class representative,"[108] I need not decide that factual dispute now.

Second, Wal-Mart argues that the named plaintiffs are not adequate representatives for

the deterred applicants.  "A fundamental requirement of representatives in a class action is that

they must be members of the subclasses they seek to represent.  The representatives must possess

the same interest and suffer the same injury as their fellow class members."[109]  The class

---

[105]*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997).

[106]Defs.' Resp. Br. at 35.

[107]*See* Pls.' Reply Br. at 35.

[108]ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 3.29 (4th ed. 2002).

[109]*Roby v. St. Louis Sw. Ry. Co.*, 775 F.2d 959, 961 (8th Cir. 1985) (citing *Rodriguez*, 431 U.S. at 403) (internal quotation omitted).

representatives here are alleged to have suffered the same injury as the deterred applicants,

namely being shut out of the opportunity of working as an over-the-road truck driver for Wal-

Mart because of the application of Wal-Mart's hiring policies.  Other courts, when addressing

word-of-mouth hiring practices similar to those alleged here, have not hesitated to certify classes

represented by applicants that included deterred applicants.[110]  While the named plaintiffs made

it farther in Wal-Mart's hiring process than the class members who were deterred from applying

at the outset, Wal-Mart has not made any showing of how that factual difference might lead to

conflicting interests between the named plaintiffs and the class members who are deterred

applicants such that recognizing independently represented subclasses would be appropriate.[111]

At this point, I do not see potential for conflict between the interests of the named plaintiffs and

the class members who were deterred applicants.[112]

Third, Wal-Mart argues that the named plaintiffs are not adequate class representatives

because, by not seeking compensatory damages, they "place themselves in conflict with any

absent class members who might have claims for such damages."[113]  All the cases cited by Wal-

---

[110]*See, e.g.*, *Catlett*, 828 F.2d at 1262 (class representatives were all applicants who represented a class including "all females who applied or might have applied"); *Van*, 672 F. Supp. at 1308-09 (class representatives were applicants who represented a class including "[a]ll women who are past or present applicants [or who were] deterred from applying").

[111]*See, e.g.*, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831-32 (1999) (finding that district court should have ensured that the "potentially conflicting interests of easily identifiable categories of claimants be protected by provisional certification of subclasses under Rule 23(c)(4)").

[112]I can create subclasses if this becomes an issue later.  FED. R. CIV. P. 23(c)(1)(C), (c)(4); *see also U.S. Fid. & Guar. Co. v. Lord*, 585 F.2d 860, 865 (8th Cir. 1978) ("[T]he district court can redefine the class or create subclasses, on its own initiative, or on motion of any party.").

[113]Defs.' Resp. Br. at 36.

Mart in support of this argument were concerned with the potential preclusive effect of the class judgment on any class member having a significant claim for compensatory damages.[114]  While I recognize the principle that a court "cannot predetermine the res judicata effect of the [class] judgment,"[115] I can assess the risk of res judicata in order to determine the adequacy of the class representation.[116]  The principle that a "class action suit seeking only declaratory and injunctive relief does not bar subsequent individual damage claims by class members, even if based on the same events," is well established.[117]  To the extent Plaintiffs seek declaratory and injunctive relief, as well as back pay,[118] I am not concerned about the res judicata effect of this class action for those class members who want to pursue compensatory damages in individual suits.

Plaintiffs' claim for punitive damages, however, is another matter.  It may raise res-judicata concerns for any class member wishing to pursue compensatory damages in an

---

[114]*See Thompson v. Am. Tobacco Co., Inc.*, 189 F.R.D. 544, 550-51 (D. Minn. 1999); *Zachary v. Texaco Exploration & Prod., Inc.*, 185 F.R.D. 230, 243 (W.D. Tex. 1999); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 606-07 (S.D.N.Y. 1982).

[115]*Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 396 (1996); FED. R. CIV. P. 23(c)(3) advisory committee's note.

[116]*Coleman v. Gen. Motors Acceptance Corp.*, 220 F.R.D. 64, 80-81 (M.D. Tenn. 2004).

[117]*Hiser v. Franklin*, 94 F.3d 1287, 1291 (9th Cir. 1996); *see also Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867 (1984); *Fortner v. Thomas*, 983 F.2d 1024, 1031 (11th Cir. 1993); *Norris v. Slothouber*, 718 F.2d 1116, 1117 (D.C. Cir. 1983); *In re Jackson Lockdown/MCO Cases*, 568 F. Supp. 869, 892 (E.D. Mich. 1983) ("[E]very federal court of appeals that has considered the question has held that a class action seeking only declaratory and injunctive relief does not bar subsequent individual suits for damages based on the same or similar conditions.").

[118]*See* Samuel Issacharoff, *Preclusion, Due Process, and the Right to Opt Out of Class Actions*, 77 NOTRE DAME L. REV. 1057, 1078 (2002) (drawing the distinction between equitable remedies and traditional common-law compensatory remedies in describing the res-judicata effect of class actions).

individual suit.[119]  While I recognize that most of the members of the proposed class would

probably have insignificant compensatory claims, if any, I am unwilling to entirely dismiss the

possibility that a few members of the proposed class might have claims for significant

compensatory damages.  However, I believe that severing the issue of punitive damages under

Rule 23(c)(4)(A) and certifying a class only on the issues of classwide liability and declaratory

and equitable relief removes any res-judicata risk.  Thus, I find that the named plaintiffs are

adequate representatives of the proposed class.

## III.     CERTIFICATION UNDER RULE 23(B)

Besides meeting the Rule 23(a) requirements of commonality, typicality, numerosity, and

adequacy of representation, a plaintiff must also show that the proposed class meets the

requirements of one of the three categories listed in Rule 23(b).   The relevant portion of Rule

23(b) is:

> (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> * * *
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature

---

[119]*See id.*

of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. [120]

Plaintiffs seek class certification under Rule 23(b)(2) or, as an alternative, Rule 23(b)(3).

### A.        Rule 23(b)(2)

Rule 23(b)(2) requires Plaintiffs to show that Wal-Mart "acted or refused to act on grounds generally applicable to the class."[121]  Wal-Mart's hiring policies, as discussed above, meet that requirement.  Wal-Mart argues, however, that Plaintiffs' proposed class cannot be certified under Rule 23(b)(2) because claims for monetary damages predominate over Plaintiffs' claims for declaratory and injunctive relief.

### 1.        Predomination under Rule 23(b)(2)

Proposed Rule 23(b)(2) classes involving claims for monetary damages should be treated with special care.  "[T]he class treatment of claims for monetary damages implicates the Seventh Amendment and due process rights of individual class members," since such claims involve individual interests that are "necessarily heterogenous in nature."[122]  Classes certified under Rule 23(b)(3) are required to provide the additional procedural protections of notice and the opportunity to opt out precisely because of the risks attendant with aggregating individual claims for monetary damages.[123]  The federal rules contain no such requirement for Rule 23(b)(2)

---

[120]FED. R. CIV. P. 23(b).

[121]*Id.*

[122]*Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 448 (6th Cir. 2002) (citing *Ortiz*, 527 U.S. at 846).

[123]FED. R. CIV. P. 23(c)(2) advisory committee's note.

classes,[124] however, because the "very nature of a (b)(2) class" is homogeneity "without any conflicting interests between the members of the class."[125]  Thus, whether the monetary relief requested by a Title VII plaintiff seeking class certification is allowable under Rule 23(b)(2) must be carefully determined in order to protect the individual interests at stake and ensure that the underlying assumption of homogeneity is not undermined.[126]

The advisory committee provided guidance as to when monetary relief is allowable in a (b)(2) class.  They state that Rule 23(b)(2) does not extend to "cases in which the appropriate final relief relates exclusively or predominately to money damages."[127]  Neither the advisory committee's notes nor the Eighth Circuit has defined "predominately."  However, the weight of authority holds that money damages predominate when they are not incidental to declaratory and injunctive relief, i.e., when the damages do not "flow directly from liability to the class *as a*

---

[124]Whether such requirements can be grafted onto a (b)(2) class will be discussed below.

[125]*Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 256 (3d Cir. 1975).

[126]The Supreme Court has questioned in dicta whether monetary damages can *ever* be recovered in a Rule 23(b)(2) class action, stating that there was at least a "substantial possibility" that they could not.  *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121 (1994).  The Supreme Court has never squarely faced the issue, however.  And holding that no monetary relief could be recovered in a (b)(2) class flies in the face of long established circuit-court precedent.

[127]Fed. R. Civ. P. 23 advisory committee's notes.

*whole* on the claims forming the basis of the injunctive or declaratory relief."[128]  The Fifth

Circuit explained this definition in the landmark case *Allison v. Citgo Petroleum Corporation*:

> [T]he recovery of incidental damages should typically be concomitant with, not
> merely consequential to, class-wide injunctive or declaratory relief.  Moreover, such
> damages should at least be capable of computation by means of objective standards
> and not dependent on the intangible, subjective differences of each class member's
> circumstances.   Liability for incidental damages should not require additional
> hearings to resolve the disparate merits of each individual's case; it should neither
> introduce new and substantial legal or factual issues, nor entail complex
> individualized determinations.[129]

If the monetary relief sought is a group remedy rather than an individual-by-individual remedy,

however, it does not predominate and the class can be certified under Rule 23(b)(2).[130]  The Fifth

Circuit in *Allison* gave a hypothetical where a defendant's liability entitled the class to a

statutorily-mandated damages award as an example of when monetary damages would not

predominate over injunctive and declaratory relief.[131]

---

[128]151 F.3d 402, 415 (5th Cir. 1998); *see also Barabin v. Aramark Corp.*, No. 02-8057, 2003 WL 355417, at *1-*2 (3d Cir. Jan. 24, 2003) (adopting the Allison approach to incidental damages); *Coleman*, 296 F.3d at 448; *Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001); *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999).  *But see Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 164 (2d Cir. 2001) (rejecting the Fifth Circuit's incidental damages approach as defined in *Allison* in favor of an ad hoc balancing determination); *Molski v. Gleich*, 318 F.3d 937, 950 (9th Cir. 2003) (refusing to follow Allison because it "would nullify the discretion vested in the district courts through Rule 23" and might have "troubling implications for the viability of future civil rights actions, particularly those under the Civil Rights Act of 1991").

[129]*Allison*, 151 F.3d at 415.

[130]*Murray*, 244 F.3d at 812.

[131]*Allison*, 151 F.3d at 415.

a.      **Back Pay**

While the back-pay remedy Plaintiffs seek would seem to be classified as non-incidental

damages under the above definition, courts have uniformly held that back pay does not

predominate over the declaratory and injunctive relief sought by Title VII plaintiffs.  "[T]he

availability of equitable monetary remedies in [Rule 23(b)(2)] class actions is entrenched as a

matter of precedent."[132]  As the Eighth Circuit has stated, "Though Rule 23(b)(2) relates to class

claims on which declaratory and injunctive relief is sought, this Court has observed in

conformity with the majority of federal courts, that the fact pecuniary relief in the form of back

pay is sought incidental to injunctive relief will not preclude certification."[133]  Courts have

distinguished back pay from all other forms of monetary relief and exempted back pay from the

rigors of the "incidental" determination.  In *Allison*, the Fifth Circuit stated that because back

pay is a remedy historically available in Title VII class actions, it is considered incidental by

precedent and courts need not engage in further analysis.[134]  Thus, although individualized

analysis may be required in determining each individual class member's entitlement to back pay,

---

[132]Daniel F. Piar, *The Uncertain Future of Title VII Class Actions After the Civil Rights Act of 1991*, 2001 BYU L. REV. 305, 319 (2001); *see also Cooper v. S. Co.*, 390 F.3d 695, 720 (11th Cir. 2004) ("Back pay is considered equitable relief and can therefore be awarded in a case certified under Rule 23(b)(2)."); *Jefferson*, 195 F.3d at 896 (mentioning the tradition in Title VII where back pay was allowed to be recovered in a Rule 23(b)(2) class action and noting that "back pay is a form of equitable relief, but this relief was treated as incidental to the injunction").

[133]*Marshall v. Kirkland*, 602 F.2d 1282, 1295 (8th Cir. 1979) (footnote and quotation omitted).

[134]*See Allison*, 151 F.3d at 416 n.10.

that alone has not stopped courts from certifying classes with claims for back pay under Rule 23(b)(2).[135]

### b.    Punitive Damages

The more perplexing question is whether the punitive damages Plaintiffs' seek predominate over the declaratory and injunctive relief sought.  Both parties were afforded an opportunity at the April 24, 2007, hearing to provide further argument on this difficult issue. While several courts have addressed the question of whether compensatory damages,[136] or compensatory damages coupled with a request for punitive damages,[137] are incidental to declaratory and injunctive relief under Rule 23(b)(2), few courts have addressed the question of whether a request for punitive damages alone defeats certification under Rule 23(b)(2).[138]

In order to resolve this question, I must determine the nature of the claim for punitive damages in this case.  Punitive damages are available in claims under Title VII where the

---

[135]*See Kirby v. Colony Furniture Co., Inc.*, 613 F.2d 696, 699-700 (8th Cir. 1980); *see also Allison*, 151 F.3d at 415 (noting that back pay is "an equitable remedy similar to other forms of affirmative injunctive relief permitted in (b)(2) class actions").

[136]*See, e.g.*, *Coleman*, 296 F.3d at 446-48; *Robinson*, 267 F.3d at 155; *Murray*, 244 F.3d at 812; *Taylor v. D.C. Water & Sewer Auth.*, 205 F.R.D. 43 (D.D.C. 2002); *Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 322, 335 (N.D. Ill. 1995) (citing cases).

[137]*See, e.g.*, *Lemon v. Int'l Union of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d 577, 579 (7th Cir. 2000); *Allison*, 151 F.3d at 416-18; *Adler v. Wallace Computer Co.*, 202 F.R.D. 666 (N.D. Ga. 2001); *Hoffman v. Honda of Am. Mfg., Inc.*, 191 F.R.D. 530 (S.D. Ohio 1999); *Faulk v. Home Oil Co., Inc.*, 186 F.R.D. 660 (M.D. Ala. 1999).

[138]*See Carlson v. C.H. Robinson Worldwide, Inc.*, No. 02-3780, 2005 WL 758602, at *16 (D. Minn. Mar. 31, 2005); *Dukes*, 222 F.R.D. at 170-71, *aff'd*, 474 F.3d 1214 (9th Cir. 2007); *Anderson v. Boeing Co.*, 222 F.R.D. 521, 542 (N.D. Okla. 2004); *Palmer v. Combined Ins. Co. of Am.*, 217 F.R.D. 430 (N.D. Ill. 2003).  Plaintiffs can request punitive damages without also asking for compensatory damages because the Eighth Circuit is one of the circuits that allows an award of punitive damages without any award of compensatory damages.  *Anderson*, 222 F.R.D. at 542 (citing cases).

employer has engaged in intentional discrimination and has done so with malice or reckless indifference to the federally protected rights of "an aggrieved individual."[139]  Wal-Mart argues that the punitive damages Plaintiffs seek are an individualized remedy.[140]  Plaintiffs, on the other hand, assert that their request for punitive damages is a form of classwide relief.[141]

In most cases, punitive damages are an individualized, and not a classwide, remedy.  To be eligible to receive punitive damages an individual plaintiff must "establish that the defendant possessed a reckless indifference to the plaintiff's federal rights – a fact-specific inquiry into that plaintiff's circumstances."[142] Furthermore, given the Supreme Court's repeated insistence that an award of punitive damages be reasonably related to the harm to the individual plaintiff.[143] an award of punitive damages often must include an inquiry into each plaintiff's individual

---

[139]42 U.S.C. § 1981a(b)(1).

[140]Defs.' Resp. Br. at 41-42.

[141]Pls.' Br. at 42-45.

[142]*Lemon*, 216 F.3d at 581.

[143]*See Philip Morris USA v. Williams*, 127 S. Ct. 1057, 1065 (2007) (holding that the "Due Process Clause prohibits a State's inflicting punishment for harm caused strangers to the litigation."); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003)  ("[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."); *BMW of N. Am. v. Gore*, 517 U.S. 559, 580 (1996) ("The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff.").  Oftentimes that means that the amount of punitive damages awardable to an individual plaintiff is bounded by some ratio of the compensatory damages awarded to that plaintiff.  *See, e.g.*, *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23 (1991) (suggesting that a four-to-one ratio of punitive damages to compensatory damages was "close to the line" of constitutional impropriety).

circumstances in order to determine the amount of punitive damages awardable to that plaintiff.[144]

Plaintiffs here argue, however, that their claim for punitive damages could be considered on a classwide basis rather than individually because their claim is based on a pattern of similar acts perpetrated by Wal-Mart.  Plaintiffs assert that, because the focus of punitive damages is on Wal-Mart's conduct, and not the injury to each class member, classwide punitive damages is appropriate in this case.[145]  The Fifth Circuit in *Allison* left open the question of whether, in cases involving a pattern of illegal acts, punitive damages could be considered on a classwide basis. *Allison* involved a class-action challenge to Citgo's promotion and hiring policies, which were similar to Wal-Mart's hiring policies at issue here.[146]  The plaintiffs sought to certify a class of all African American employees and applicants of Citgo, and included a request for both compensatory and punitive damages on behalf of the class.[147]  *Allison* held that the district court properly denied certification.[148]  On the road to that holding, the Fifth Circuit assumed that punitive damages "may be awarded on a class-wide basis, without individualized proof of injury,

---

[144]*See Campbell*, 538 U.S. at 423 ("A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business.").

[145]Pls.' Reply Br. at 44.

[146]*Allison*, 151 F.3d at 407 (use of an informal word-of-mouth announcement process by the defendant Citgo to fill job vacancies and the use of a subjective decisionmaking process by Citgo's predominantly white supervisory staff in reviewing applicants for hire and employees for promotion).

[147]*Id.*

[148]*Id.*

where the entire class or subclass is subjected to the same discriminatory act or series of acts."[149] The court found, however, that "no such discrimination is alleged in this case."[150]  The Fifth Circuit was careful to note that the *Allison* plaintiffs did "not contend that each [class member] was affected by these policies and practices in the same way."[151] The court observed that any award of punitive damages would therefore be "uniquely dependent on the subjective and intangible differences of each class member's individual circumstances" since "[s]ome discriminatory policies may have been implemented more – or less – harshly depending on the department or facility involved."[152]

Here, Plaintiffs do allege that each potential class member has been affected by Wal-Mart's hiring policies and practices in a similar way.  Furthermore, Plaintiffs rely on *Williams v. ConAgra Poultry Company*[153] for the proposition that punitive damages may be awarded on a classwide basis, without individualized proof of injury.[154]  The Eighth Circuit in *Williams* decided to remit a punitive-damages award to an individual plaintiff that was based, in part, on proof of the defendant's discriminatory conduct towards others.  On the way to that decision, the Eighth Circuit observed  in dictum:

> Where there has been a pattern of illegal conduct resulting in harm to a large group of people, our system has mechanisms such as class action suits for punishing

---

[149]*Id*. at 417.

[150]*Id*.

[151]*Id*.

[152]*Id*. at 417, 418.

[153]378 F.3d 790 (8th Cir. 2004).

[154]*See* Pls.' Br. at 43-44.

34

> defendants.  Punishing systematic abuses by a punitive damages award in a case brought by an individual plaintiff, however, deprives the defendant of the safeguards against duplicative punishment that inhere in the class action procedure.[155]

Plaintiffs urge me to read that statement as a recognition by the Eighth Circuit that some awards of punitive damages may flow to a class as a whole.[156]  Plaintiffs' argument is not without appeal, since a case where punitive damages flows to a class as a whole –  rather than existing merely as an individual-by-individual remedy –  is not inconceivable, if one reflects on the Eighth Circuit's example of a "pattern of illegal conduct."[157]  Nevertheless, when the court in *Williams* made the above statement, it was not confronted with the whole host of issues a request for punitive damages raises at the class certification stage.  Thus, I am chary of basing my decision on a single statement by the Eighth Circuit in a case that did not present the same issues as are presented here.

Furthermore, Plaintiffs' claim for punitive damages would be non-incidental even if a jury in this case were to find that Wal-Mart engaged in a pattern of discriminatory acts that affected class members in a similar way.  Even after such a finding, a jury would not be able to determine the extent of the harm caused by Wal-Mart's conduct, and as a corollary the extent of

---

[155]*Williams*, 378 F.3d at 797.

[156]*Cf. Anderson*, 222 F.R.D. at 541 ("Because the purpose of punitive damages is not to compensate the victim, . . . [the inquiry] hinges, not on facts unique to each class member, but on the defendant's conduct toward the class as a whole."); *Barefield v. Chevron, U.S.A., Inc.*, No. C 86-2427, 1988 WL 188433, *3 (N.D. Cal. Dec. 6, 1988) (holding that a class-wide request for punitive damages was incidental to declaratory and injunctive relief because it did not detract from the "homogeneity or cohesiveness" of the 23(b)(2) class).

[157]If, for instance, the defendant acts in the same manner towards each class member while at the same time perceiving the risk that such a policy may violate those class members' federally-protected rights, then a claim for punitive damages might be thought of as flowing to the class as a whole upon a finding of liability.

the need for punishment and deterrence,[158] at the classwide stage without engaging in further individualized determinations.  The reason for the need for further proceedings is simple.

Typically, a court or jury is not able to determine, until the conclusion of the second stage of a *Teamsters*-style proceeding, which alleged class members were actually harmed by the defendant's pattern of discriminatory acts and which were not.[159]  Thus, unless each alleged class member *has actually suffered harm from the pattern of illegal acts* – which is highly unlikely – Wal-Mart would be over-deterred by any classwide award of punitive damages.  Individualized determinations are necessary to fully realize the extent of the harm caused by Wal-Mart's conduct and properly assess the need for punishment and deterrence.  Such individualized determinations in this case would include whether each proposed class member met Wal-Mart's minimum requirements at the time he or she applied for a position as an over-the-road truck driver or was deterred from applying; whether each proposed class member applied to a transportation office that was currently hiring at the time of the application; and whether Wal-Mart denied employment to an individual applicant who met the minimum requirements for

---

[158]*See Williams*, 127 S. Ct. at 1062 ("This Court has long made clear that punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition.") (internal quotation and alteration omitted).

[159]*See Teamsters*, 431 U.S. at 371-72 ("The task remaining for the District Court [after finding a pattern-and-practice of discrimination] will not be a simple one.  Initially, the court will have to make a substantial number of individual determinations in deciding which of the minority employees were actual victims of the company's discriminatory practices.").

lawful reasons. Because of the need for those individualized determinations, I find that, in this case, the punitive damages Plaintiffs seek predominate over their claims for injunctive and declaratory relief .[160]

### 2.        Opting Out of a Rule 23(b)(2) Class

Plaintiffs argue that the due-process problems caused by allowing non-incidental damages in a Rule 23(b)(2) class can be avoided if class members are given notice and an opportunity to opt out as other courts have done.[161]  Allowing class members to opt out arguably relieves any due-process concerns.[162]  However, the Eighth Circuit foreclosed this option in *DeBoer v. Mellon Mortgage Company*, where it stated that "the privilege to opt-out of the action should be operable only when the class action is maintainable under [Rule 23(b)(3)] alone."[163] While Plaintiffs urge me to distinguish *DeBoer* on the facts, as the court did in *Robinson v. Sears, Roebuck and Company*,[164] I decline the invitation.  The court in *Robinson* distinguished *DeBoer* on the grounds that it involved incidental damages and therefore did not confront the

---

[160]Although this conclusion appears to be inconsistent with allowing back pay in a (b)(2) class—a remedy which will potentially involve just as many individualized determinations as an award of punitive damages—it is worth reiterating that the back-pay remedy has been historically recoverable in Rule 23(b)(2) Title VII class actions, while punitive damages have not.

[161]111 F. Supp. 2d 1101, 1127 (E.D. Ark. 2000); *see also Eubanks v. Billington*, 110 F.3d 87, 93-94 (D.C. Cir. 1997) (collecting cases).

[162]*See* Robert M. Brava-Partain, Note, *Due Process, Rule 23, and Hybrid Classes: A Practical Solution*, 53 HASTINGS L.J. 1359, 1369-70 (2002).

[163]64 F.3d 1171, 1175 (8th Cir. 1995).

[164]*Robinson*, 111 F. Supp. 2d at 1127.

question of opting out of a Rule 23(b)(2) class in the context of non-incidental damages.[165]
*Robinson* did not explain why the distinction between incidental and non-incidental damages
would make a difference.  Given the Eighth Circuit's stated reason for preferring a mandatory
class over a Rule 23(b)(3) opt-out class – i.e. "to avoid unnecessary inconsistencies and
compromises in future litigation"[166] – the distinction between incidental and non-incidental
damages appears immaterial, since the whole point of having a mandatory Rule 23(b)(2) class is
destroyed if opting out is allowed regardless of whether the damages involved are incidental or
are not incidental to the declaratory and injunctive relief.  Thus, according to *DeBoer*, if
Plaintiffs want the right to opt out, they can get it only in a Rule 23(b)(3) class.

### B.      Rule 23(b)(3)

Plaintiffs request, as an alternative to Rule 23(b)(2), that either their proposed class be
certified entirely under Rule 23(b)(3) or that two classes be certified: one under Rule 23(b)(2) for
the issues of liability and declaratory and equitable relief, the other under Rule 23(b)(3) on the
issue of punitive damages.  In addition to the Rule 23(a) requirements,

> a class certified under Rule 23(b)(3) must meet that provision's heightened
> requirements that '[common] questions of law or fact . . . predominate over any
> questions affecting only individual members, and that a class action is superior to
> other available methods for the fair and efficient adjudication of the controversy.'"[167]

---

[165]*Id.*

[166]64 F.3d at 1175.

[167]*Blyden v. Mancusi*, 186 F.3d 252, 269 (2d Cir. 1999) (quoting FED. R. CIV. P.
23(b)(3)).

While this is a close issue, I find that the superiority and predominance requirements, though not necessary for certification under Rule 23(b)(2),[168] pose an insuperable barrier to certification of Plaintiffs' proposed class under Rule 23(b)(3).

As mentioned above, recovery of punitive damages in Title VII cases is a fact-specific inquiry requiring "individualized and independent proof of injury to, and the means by which discrimination was inflicted upon, each class member."[169] Regardless of whether Plaintiffs are able to establish a pattern or practice of discrimination at the liability stage, a jury or juries[170] still would have to make a "substantial number of individual determinations"[171] in deciding which of the alleged class members were actual victims and thus entitled to collect a share of the back pay and punitive damages.[172] Such individual determinations include whether each proposed class member met Wal-Mart's minimum requirements at the time he or she applied for a position as an

---

[168]*Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 426 n.29 (5th Cir. 2004) ("[P]roposed (b)(2) classes need not withstand a court's independent probe into the superiority of the class action over other available methods of adjudication[,] as (b)(3) classes must.").

[169]*Allison*, 151 F.3d at 419.

[170]Title VII plaintiffs have a right to a jury trial when they request punitive damages, 42 U.S.C. § 1981a(c), and Plaintiffs have exercised that right here.  Doc. No. 40 at 16.

[171]*Teamsters*, 431 U.S. at 371.

[172]*Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 (11th Cir. 1997); *see also Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1235 (11th Cir. 2000) ("Given that each plaintiff must demonstrate that he or she suffered from intentional discrimination, however, we expect that most, if not all, of the plaintiffs' claims will stand or fall, not on the answer to the question whether [Avis] has a practice or policy of [ethnic] discrimination, but on the resolution of . . . highly case-specific factual issues.") (internal quotation omitted); *Adams v. Henderson*, 197 F.R.D. 162, 172 (D. Md. 2000) ("The issue of liability will depend on the circumstances surrounding each individual employment decision, relating to each class member.  This will require individualized evidence as to the qualifications of the persons who applied for and received promotions, as well as the qualifications of the persons who were denied those promotions."); *Ramirez v. DeCoster*, 194 F.R.D. 348, 354 (D. Me. 2000).

over-the-road truck driver or was deterred from applying; whether each proposed class member applied to a transportation office that was currently hiring at the time of the application; and whether Wal-Mart denied employment to an individual applicant who met the minimum requirements for lawful reasons.[173]  The individual issues involved in these "mini-trials" for each potential class member would swamp the litigation and, as a result, detract from a class action's superiority over other methods of adjudication.  Furthermore, because the Plaintiffs have exercised their right to a jury trial, the impact of these individualized issues on the management of the litigation could not be lessened by the use of more efficient litigation techniques, such as the use of a special master or other similar timesaving device.[174]  Finally, "the most compelling rationale for finding superiority in a class action" – the negative value suit – is missing in this case.[175]  Because of their claim for punitive damages, then, Plaintiffs cannot meet the predominance and superiority requirements of Rule 23(b)(3), either for the entire proposed class or a separate punitive-damages only class.

---

[173]If Plaintiffs establish that Wal-Mart's hiring polices amounted to a pattern-or-practice of discrimination, then the burden would rest on Wal-Mart to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons.  *Teamsters*, 431 U.S. at 362.

[174]*Allison*, 151 F.3d at 409; *see also* Piar, *supra*, at 318 ("While not entirely formulaic, [back pay determinations, as opposed to the determinations necessary for awards of compensatory or punitive damages,] are made according to methods of calculation that are well developed and can be applied with some degree of classwide efficiency, especially because they need not be determined by juries.").

[175]*Allison*, 151 F.3d at 420.

### C.      Rule 23(c)(4)(A) Severance

Although Plaintiffs' class claim for punitive damages throws a monkey wrench in certification under either Rule 23(b)(2) or Rule 23(b)(3), that is not the end of the matter.  In my letter to the parties dated April 4, 2007, I raised the question of whether I could sever the request for punitive damages under Rule 23(c)(4)(A) and certify a Rule 23(b)(2) class on the issues of classwide liability, declaratory relief, and equitable relief.  To that possibility I now turn.  Rule 23(c)(4)(A) states that "[w]hen appropriate an action may be brought or maintained as a class action with respect to particular issues."[176]  A district court may utilize Rule 23(c)(4)(A) on its own initiative.[177]  "The theory of Rule 23(c)(4)(A) is that the advantage and economies of adjudicating issues that are common to the entire class on a representative basis should be secured even though other issues in the case may have to be litigated separately by each class member."[178]  "[T]he relevant inquiry under Rule 23(c)(4)(A) is whether resolution of the particular common issues would materially advance the disposition of the litigation as a whole."[179]

The advisory committee envisioned severance of liability issues from damages issues as an appropriate use of Rule 23(c)(4)(A).[180]  Other courts have severed claims for punitive and

---

[176]Fed. R. Civ. P. 23(c)(4)(A).

[177]*Robinson v. Gillespie*, 219 F.R.D. 179, 185 (D. Kan. 2003).

[178]7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1790 (3d ed. 2005).

[179]*Emig v. Am. Tobacco Co.*, 184 F.R.D. 379, 395 (D. Kan. 1998) (internal quotation omitted).

[180]The advisory committee's note states:
This provision recognizes that an action may be maintained as a class action as to

compensatory damages from the determination of liability and declaratory and equitable relief in Title VII pattern-and-practice class actions.[181]  Thus, under Rule 23(c)(4)(A), I am severing the issue of punitive damages and certifying a class under Rule 23(b)(2) on the issues of classwide liability, declaratory relief, and equitable relief.[182]  I believe this option makes the best use of judicial resources and the efficiencies of the class-action device to materially advance this litigation, while at the same time protecting the due-process rights of individual class members and avoiding the difficult legal and managemental issues attendant to aggregating individual punitive-damages claims.  Any class member wishing to bring an individual suit for punitive or compensatory damages after the conclusion of this litigation will be free to do so without worrying about the risk of res judicata.[183]

---

particular issues only.  For example, in a fraud or similar case the action may retain its "class" character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims.

FED. R. CIV. P. 23(c)(4)(A) advisory committee's note; *See also* Hannah Stott-Bumsted, Note, *Severance Packages: Judicial Use of Federal Rule of Civil Procedure 23(c)(4)(A)*, 91 GEO. L.J. 219, 222 (2002).

[181]*See, e.g.*, *Carlson v. C.H. Robinson Worldwide, Inc.*, No. 02-3780, 2005 WL 758602, at *16 (D. Minn. Mar. 31, 2005); *Morgan v. United Parcel Serv. of Am., Inc.*, 169 F.R.D. 349, 358 (E.D. Mo. 1996).

[182]*Robinson*, 267 F.3d at 167 ("District courts should take full advantage of [Rule 23(c)(4)(A)] to certify separate issues in order to reduce the range of disputed issues in complex litigation and achieve judicial efficiencies.") (internal quotations omitted).

[183]*See* Issacharoff, *supra*, at 1073 (limiting certification to those claims that actually fit the Rule 23(b)(2) model leaves "individuals free to pursue their separate claims should individual class members . . . find that these claims merited individual prosecution" without the fear that those claims have been waived in the class action).

**CONCLUSION**

Based on all the filings and proceedings on the Plaintiffs' motion, and for the reasons

stated above, Plaintiffs' Motion for Class Certification is GRANTED IN PART and DENIED IN

PART.  I certify the following class under Federal Rule of Civil Procedure 23(b)(2) for purposes

of classwide liability, declaratory relief, and equitable relief only:

> a. African American persons who reside in the continental United States of America who have applied for employment as over-the-road truck drivers at Wal-Mart since September 22, 2001, and who have not been hired; and

> b. African American persons who reside in the continental United States of America who were deterred or thwarted from applying for positions as over-the-road truck drivers at Wal-Mart due to Wal-Mart's challenged policies and practices.

> IT IS SO ORDERED this 16th day of May, 2007.


/s/ Wm. R.Wilson,Jr.
UNITED STATES DISTRICT JUDGE